CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2006-3825                                      DIVISION ""

ELIZABETH BOLTON HASSINGER, MARY BOLTON JENNINGS,
ROBERT H. BOLTON, JR., CATHERINE HASSINGER DRENNAN,
MARY HASSINGER SCHMIDT, ELIZABETH HASSINGER VAN HORN,
ELIZABETH BOLTON JENNINGS, JAMES K. JENNINGS III, PAUL M. DAVIS, JR.,
FRANCES BOLTON DAVIS, PAUL M. DAVIS, III, JAMES BOLTON DAVIS,
FRANCES SENTELL DAVIS, FRANKLIN HAAS MIKELL, WILLIAM HENRY HODGES,
JR., JOY N. HODGES, LUCILLE HODGES, PHILIP N. HODGES, ROANE E. HATHORN,
PAT BOLTON, FAY DEWITT, SUZANNE BOLTON MELLOR, and the SUCCESSION OF
ELIZABETH BROOKS BOLTON c/o MARTHA BARTON

VERSUS

JP MORGAN CHASE AND COMPANY

FILED:_____          _____
                                        DEPUTY CLERK

## PETITION

NOW INTO COURT, through undersigned counsel, come Elizabeth Bolton Hassinger,

Mary Bolton Jennings, Robert H. Bolton, Jr., Catherine Hassinger Drennan, Mary Hassinger

Schmidt, Elizabeth Hassinger Van Horn, Elizabeth Bolton Jennings, James K. Jennings III, Paul

M. Davis, Jr., Frances Bolton Davis, Paul M. Davis, III, James Bolton Davis, Frances Sentell

Davis, Franklin Haas Mikell, William Henry Hodges, Jr., Joy N. Hodges, Lucille Hodges, Philip

N. Hodges, Roane E. Hathorn, Pat Bolton, Fay Dewitt, Suzanne Bolton Mellor, and the

Succession of Elizabeth Brooks Bolton c/o Martha Barton ("Plaintiffs"), who respectfully file

this Petition against JP Morgan Chase and Company ("JP Morgan" or "Defendant").

I.

Plaintiffs are individuals domiciled in the State of Louisiana, Parish of Orleans and

various other places.

II.

Defendant is the successor of First Commerce Corporation ("First Commerce"), Banc

One Corporation, and Bank One Corporation.



EXHIBIT
"A"

### III.

Plaintiffs are the former holders of over $36,000,000 of debentures convertible into First Commerce stock.  The debentures were received in connection with the sale by Plaintiffs of their stock in Rapides Bank and Trust Co. in July of 1985.

### IV.

On or about June 12, 1998, First Commerce merged into Banc One Corporation ("Banc One").

### V.

As a result of the merger, the Plaintiff's debentures formerly convertible into First Commerce stock became debentures convertible into shares of Banc One stock.

### VI.

In or around November of 2000, the Plaintiffs' debentures were converted in accordance with the terms of the debentures into shares of stock in Banc One.

### VII.

On or about July, 2004, Bank One Corporation ("Bank One") (the surviving entity of the merger between Banc One and First Chicago NBD) merged into JP Morgan.

### VIII.

As a result of this merger, Plaintiffs' Bank One shares were exchanged for shares of JP Morgan stock.

### IX.

Approximately a year after the merger between First Commerce and Banc One, Banc One disclosed that the success and growth of the credit card operations owned by Banc One were not as strong and healthy as purported to be at the time of the merger.

### X.

These disclosures demonstrated that the market was overvaluing Banc One's stock at the time of the merger based on incomplete and incorrect information and that First Commerce shareholders should have received more shares of Banc One in exchange for their First Commerce stock.

### XI.

On or about August 18, 2000, a class action complaint was filed against Bank One and several former officers of Banc One.

### XII.

This class action complaint was styled "*Thomas Levitan v. John B. McCoy, Jr., Richard J. Lehmann, Michael J. McMennamin and Bank One Corporation,*" and it was filed in the United States District Court for the Northern District of Illinois, Eastern Division.

### XIII.

A copy of the class action complaint is attached hereto as Exhibit "A." The factual allegations of that suit are adopted herein to the extent applicable to the claims herein.

### XIV.

In the complaint the plaintiffs allege, among other things, that the exchange ratio used in the merger between First Commerce and Banc One was unfair from a financial point of view to the shareholders of First Commerce. *See* Exhibit "A" at ¶¶ 44-46.

### XV.

As a result of the misrepresentations and omissions by Banc One and the unfair exchange ratio used at the time of the merger, the plaintiffs requested damages from the defendants for violations of §11, §12(A)(2) and §15 of the Securities Act of 1934. *See id.* at ¶¶ 107-131.

### XVI.

In late 2005, some of the plaintiffs received a "Notice of Proposed Settlement of Class Action, Hearing on Proposed Settlement, Attorneys' Fee Petition and Petition for Award to Lead Plaintiffs."

### XVII.

A true and correct copy of the Notice of Proposed Settlement is attached hereto as Exhibit "B."

### XVIII.

The notice was addressed to: "All persons and entities who acquired their shares of Bank One Corporation ("Bank One") common stock in exchange for their First Commerce Corporation ("First Commerce Corporation") common stock pursuant to the Registration

Statement and Merger Proxy/Prospectus, in connection with the Merger between Bank One and First Commerce Corporation on June 12, 1998." *See id.*

### XIX.

The proposed settlement does not appear to contemplate payment to the former holders of debentures convertible into First Commerce stock whose debentures were convertible into Banc One stock as a result of the merger ("Former Debenture Holders").

### XX.

The notice advised that its purpose was to inform the shareholders of a proposed payment of $39.9 million plus interest to First Commerce shareholders in settlement of the class action. See Exhibit "B."

### XXI.

There has been no payment, settlement or proposed settlement addressed to Former Debenture Holders.

### XXII.

The merger agreement between Rapides Bank and Trust Company and First Commerce contained a provision which protects the rights of Former Debenture Holders in the event of a reclassification of the common stock, or in the case of a consolidation or merger.

### XXIII.

This provision provides as follows:

> (f)  In case of any reclassification of the Common Stock (other than a subdivision or combination of outstanding shares of Common Stock), or in case of the consolidation or merger of the Company with or into any other corporation (other than a consolidation or a merger in which the Company is the continuing corporation and the outstanding shares of the Company's Common Stock are not changed into or exchanged for stock or other securities of any other person or cash or any other property as a result of or in connection with such consolidation or merger), or of the sale of the properties and assets of the Company as, or substantially as, an entirety to any other business organization, **each Debenture shall, after such reclassification, consolidation, merger or sale and upon the terms and conditions specified in this Section 13.04, be convertible into or represent the right to receive the number of shares of stock or other securities or property (including cash) to which the shares of Common Stock deliverable (at the time of such reclassification, consolidation, merger or sale)upon conversion thereof would have been entitled upon such sale, if the conversion of the Debentures into Common Stock had taken place immediately**

prior thereto; and in any case if necessary, the provisions set forth in this Subsection (f) with respect to the rights and interests thereafter of the holders of the Debentures shall be appropriately adjusted so as to be applicable, as nearly as may reasonably be, to any shares of stock or other securities or property (including cash) thereafter deliverable upon conversion of such Debentures. (emphasis added).

XXIV.

This provision entitles Former Debenture Holders to the same consideration that other shareholders received at the time of the merger or in any post merger proceeding relating to the merger itself. The Defendant is responsible contractually for payments to Plaintiffs to ensure they are treated at least as well as the common shareholders are treated.

XXV.

The provision provides the Plaintiffs with the contractual right to receive consideration equal to the highest value received by any shareholder for his shares of First Commerce, which includes the consideration paid as a result of the class action lawsuit.

XXVI.

Because the Defendant tendered an additional $39.9 million plus accrued interest to the former shareholders of First Commerce without offering appropriate consideration to the Former Debenture Holders, the Defendant has breached the contractual obligations owed to the Plaintiffs in this case.

XXVII.

The Plaintiffs are entitled to damages as a result of the Defendant's breach of contract.

XXVIII.

In addition, or in the alternative, the defendant has been unjustly enriched by receiving the ownership interests in First Commerce represented by the debentures without providing appropriate consideration to the debenture holders.

WHEREFORE, after due proceedings had, Plaintiffs prays that judgment be entered in their favor and against Defendant as follows:

(1)    That Plaintiffs be awarded all damages suffered as a result of Defendant's acts as outlined above;

(2)    That Plaintiffs be awarded the same additional consideration that Defendant has offered to other former holders of First Commerce Corporation stock; and

(3)    All other general and equitable relief to which Plaintiffs may be entitled, including prejudgment interest, post judgment interest, attorneys' fees and costs.

Respectfully submitted,

James R. Swanson, La. Bar No. 18455
Loretta G. Mince, La. Bar No. 25796
Lance C. McCardle, La. Bar No. 29971
CORRERO FISHMAN HAYGOOD PHELPS
   WALMSLEY & CASTEIX, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone:  (504) 586-5252
Facsimile:  (504) 586-5250
Attorneys for Plaintiffs

**\*Plaintiffs will serve the following Defendant via the Louisiana Long Arm Statute:**

JP Morgan Chase & Co.
through its registered agent
The Corporation Trust Co.
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801

ATTORNEY'S NAME: Swanson, James Richard, Esq.   18455
AND ADDRESS:      201 St. Charles Avenue
                  46 th. Floor
                  New Orleans  LA        70170

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

NO. 20 06-03825                                      SECTION: 06-L

        HASSINGER, ELIZABETH BOLTON              ETAL
             vs.
        JP MORGAN CHASE AND COMPANY


                    C I T A T I O N

    TO:    JP MORGAN CHASE AND COMPANY
    THROUGH: TITS REGISTERED AGENT:  THE CORPORATION TRUST CO.
             CORPORATION TRUUST CENTER 1209 ORANGE STREET
             WILMINGTON, DE


    YOU HAVE BEEN SUED:

    You must either comply with the demand contained in the petition
    ORIGINAL
    a certified copy of which accompanies this citation, or file an answer or other
    legal pleading in the office of the Clerk of this Court, Room 402, Civil Courts
    Building, 421 Loyola Avenue, New Orleans, LA, within ~~fifteen (15)~~ days after the
    ~~service~~ hereof under penalty of default.          thirty (30)
    (auxiliary) ***************** ADDITIONAL INFORMATION ****************
    *    Legal assistance is advisable.  If you want a lawyer and can't find one, you  *
    *  may call the New Orleans Lawyer Referral Service at 561-8828.  This Referral    *
    *  Service operates in conjunction with the New Orleans Bar Association.  If you   *
    *  qualify, you may be entitled to free legal assistance through the New Orleans   *
    *  Legal Assistance Corp.; you may call 529-1000 for more information.            *
    *  COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE.                        *
    *********************************************************************

    IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of The Civil
    District Court for the Parish of Orleans, State of LA May      4, 2006.


    Clerk's Office, Room 402, Civil Courts Building      DALE N. ATKINS, Clerk of
    421 Loyola Avenue                                    The Civil District Court
    New Orleans, LA                                      for the Parish of Orleans
                                                         State of LA

                                                         by _____
                                                              Deputy Clerk

-------------------------------------------------------------------
                        SHERIFF'S RETURN:
                  (for use of process servers only)

        PERSONAL SERVICE                  |        DOMICILIARY SERVICE

On this _____ day of _____             | On this _____ day of _____
    served a copy of the w/i petition    |    served a copy of the w/i petition
ORIGINAL                                 | ORIGINAL
On JP MORGAN CHASE AND COMPANY           | On JP MORGAN CHASE AND COMPANY
        in person through                |        through
TITS REGISTERED AGENT:  THE CORPORATION  | TITS REGISTERED AGENT:  THE CORPORATION
TRUST CO.                                | TRUST CO.
                                         | by leaving same at the dwellinghouse,
                                         | or usual place of abode,
                                         | CORPORATION TRUUST CENTER 1209 ORANGE ST
                                         | REET
                                         | in the hands of _____
                                         | a person of suitable age and discretion
        Returned same day                | residing therein as a member of the dom-
                                         | iciliary establishment, whose name and
                                         | other facts connected with this service
_____ No. _____     | I learned by interrogating  HIM / HER
                                         | the said JP MORGAN CHASE AND COMPANY
    Deputy Sheriff of _____      |                      being absent from
                                         | the domicile at time of said service.

                                         |        Returned same day

Mileage:  $ _____                       |
                                         | _____ No. _____
                                         |
                                         |    Deputy Sheriff of _____


                 ENTERED
    _____       _____       _____
    PAPER                      RETURN
    _____   /   _____   /   _____
    SERIAL NO.   DEPUTY       PARISH

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

**AUG 2 1 2000**

---

THOMAS LEVITAN, individually and on
behalf of all others similarly situated,

        Plaintiff,

        vs.

JOHN B. McCOY, JR., RICHARD J.
LEHMANN, MICHAEL J.
McMENNAMIN and BANK ONE CORP.,

        Defendants.

---

**00C** N° **5096**

**JUDGE COAR**

**MAGISTRATE JUDGE KEYS**

**JURY TRIAL DEMANDED**

FILED-EDS
00 AUG 18 PM 3: 39
CLERK
U.S. DISTRICT COURT

                x

## CLASS ACTION COMPLAINT

Plaintiff, on behalf of himself and all other persons similarly situated, for his class action complaint, alleges upon personal knowledge as to his own acts, and otherwise upon information and belief based on the investigation made by and through his undersigned attorneys, which included, *inter alia*, a review of the Form S-4 Registration Statement dated May 13, 1998 (the "Registration Statement") issued in connection with the June 12, 1998 merger of First Commerce Corporation ("First Commerce"), a multi-bank holding company headquartered in New Orleans, Louisiana, with and into Banc One Corporation (the "Merger"); the Joint Proxy Statement and Prospectus included within the Registration Statement (the "Merger Proxy/Prospectus"); documents incorporated by reference into the Registration Statement; and other public filings, documents and press releases of Banc One Corporation ("Banc One" or the "Company"). Banc One is the predecessor of defendant Bank One Corp. Defendant Bank One Corp. ("Bank One") is liable for the unlawful conduct of its predecessor, Banc One, under applicable principles of corporate law.

## NATURE OF ACTION

1.      Plaintiff brings this action as a class action, on behalf of himself and all other persons, except defendants, their affiliates, and certain related parties (as defined below), who exchanged shares of First Commerce common stock for shares of Banc One common stock in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus.  Pursuant to the Merger, Plaintiff and other First Commerce stockholders received 1.408 shares of Banc One common stock in exchange for each share of First Commerce common stock (the "Exchange Ratio").

2.      Prior and at the time of the Merger, which occurred on June 12, 1998, one of the major strengths of Banc One's operations and business purportedly was the tremendous growth reported at Banc One's credit card division, First USA Bank, N.A. ("First USA"), then the third largest credit card issuer in the country.  The Registration Statement included Banc One's financial statements, which reflected enormous growth in First USA's credit card business for the most recent fiscal year (1997) and, by incorporating Banc One's April 21, 1998 Form 8-K report, for the quarter ended March 31, 1998.  Based on Banc One's pre-Merger public statements, the market viewed the First USA credit card business as a major asset and strength of Banc One, as its growth in credit card accounts generated increased income for Banc One through fees, credit card loans with very positive margins, and securitizations of credit card loan portfolios.

3.      In fact, defendants' statements in the Registration Statement and Merger Proxy Prospectus — including the Banc One financial statements incorporated therein — misrepresented and/or omitted material adverse facts regarding the business and operations of First USA.  Among other things, while defendants touted the strength and success of First USA, they failed to disclose that First USA had achieved its "growth" through illegal practices,

2

including improper billing procedures and charging of excessive late fees and interest to its credit card customers, all of which violated the federal Truth in Lending Act and other laws. Defendants also misrepresented the financial success of First USA (and thus, Banc One) by issuing financial statements that, contrary to defendants' representations, did not comply with generally accepted accounting principles ("GAAP") or otherwise present fairly the financial condition of Banc One. This information was material to First Commerce shareholders considering how to vote on the Merger, including whether the Exchange Ratio accurately reflected the value of Banc One common stock.

4.      As a result of defendants' dissemination of materially false and misleading statements, and their failure to include material information in the Registration Statement and Merger Proxy/Prospectus (and other public statements, press releases, and filings with the Securities and Exchange Commission incorporated by reference therein), First Commerce shareholders approved the Merger and acquired Banc One shares pursuant to an Exchange Ratio that was artificially deflated to the detriment of Plaintiff and other First Commerce shareholders as a result of defendants' wrongful conduct.

5.      It was not until August 24, 1999 — over a year after the Merger — that defendants began a series of disclosures that would ultimately reveal the truth about the purported success and growth of the credit card operations of Banc One in the period leading up to the Merger. On August 24, 1999, Banc One issued a press release announcing preliminary earnings for the third quarter and full year of 1999. In the press release, issued after the close of trading, the Company reported that, based on "revised outlooks," it anticipated full-year 1999 operating earnings per share to be down 7% to 8% from the then-current market estimates. Banc One stated that the revised earnings outlook was the result solely of changes in the growth and

3

margin prospects for First USA. The announcement came on the heels of several quarters of purported "record earnings," particularly at First USA.

6.     In a conference call with securities analysts on August 25, 1999, it was explained that Banc One's First USA subsidiary would cease First USA's previously-undisclosed practice of "accelerating" credit card late fees, and would provide credit card customers "interest rate concessions" related to First USA's past activities. Imposition of these measures, combined with customer attrition (due to First USA's still undisclosed illegal practices discussed below), was expected to negatively impact Banc One's earnings by at least $500 million.

7.     Even though these disclosures were only the "tip of the iceberg," the market found the negative news regarding First USA to be extremely material. On August 25, 1999, the price of Banc One's common stock plunged 22.3%, or $12.625 per share, from the previous day's closing price of $55.625 per share, to close at a 52 week low of $43 per share. This decline came on volume of 39,887,000 shares, more than fifteen times the daily average trading volume for the previous 52-week period.

8.     Although the August 1999 announcement addressed the impact of First USA's performance on Banc One's 1999 results, the undisclosed illegal practices at First USA had existed long before the Merger. On November 1, 1999, Kiplinger's Personal Finance Magazine (the "Kiplinger's Article") reported that government regulators were investigating thousands of complaints by First USA credit card holders regarding First USA practices that had been in effect since before the Merger. In the first half of 1999 alone, the Office of the Comptroller of the Currency ("OCC") had received 2,793 complaints about First USA's pre-1999 practices (while the next nine largest credit card banks combined received a total of only 2,536 complaints).

4

Even more significantly, the Kiplinger's Article reported the First USA's illegal practices had existed as far back as 1997.

9.      In fact, long before the August 1999 announcements, and no later than the time the Merger became effective, several class action lawsuits alleging a variety of longtime, illegal credit card predatory practices had been filed against First USA (including at least one class action filed in June 1998, the month in which the Merger occurred). These lawsuits alleged a broad pattern of illegal credit card practices, including, *inter alia*, violations of consumer credit protection laws, such as the Federal Truth in Lending Act ("TILA").

10.     On November 10, 1999, the Company then announced that earnings would be as much as 15% lower than analysts' *revised* expectations. The earnings "shortfall" again was attributed to Banc One's credit card division's performance. The market was once again shocked by this news. The price of Banc One's stock dropped to $34.625 per share on November 10, 1999, in heavy trading volume, losing $4.50 per share, or 11.5%, from its previous day's close of $39.125 per share.

11.     On December 31, 1999, John B. McCoy, Banc One's Chairman and Chief Executive Officer, resigned as a result of the disclosures of improprieties at First USA.

12.     Finally, on January 11, 2000, Banc One announced that earnings for 1999 would be as much as 18 percent less than analysts had expected, and that profits for 2000 would drop sharply as a result of the Company's previously undisclosed problems with illegal practices at its First USA credit card operations. The Company also announced that it would take a $725 million charge in the fourth quarter of 1999, largely to restructure the credit card division. The special charge included:

- - $200 million for the early adoption of new consumer credit guidelines, including $176 million to increase provisions for credit losses, and $21 million of non-interest expense for credit card fraud losses.
- - $185 million for the write-down of certain assets and other charges at First USA; the impairment of these assets was caused by the projected earnings decline at First USA.
- - $260 million for business restructuring, including personnel, facilities, and equipment.

13.   The undisclosed violations of TILA that occurred prior to, and at the time of, the Merger, as well as the false and misleading financial statements included in the Registration Statement, caused Banc One's common stock price to be artificially inflated at the time of the Merger.  As a result, the Exchange Ratio utilized in the Merger was artificially deflated and First Commerce shareholders who exchanged their First Commerce common stock for Banc One common stock in connection with the Merger were harmed by having received insufficient value for their First Commerce common stock.

## JURISDICTION AND VENUE

14.   This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v.  The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77(o).

15.   Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §§ 1391(b) and 1391(c).  Defendant Bank One has executive offices located in this District and does substantial business in this District.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred and/or had their primary effects in this District.

6

16.     In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## THE PARTIES

### A.     Plaintiff

17.     Prior to the Merger, plaintiff (the "Plaintiff") held shares of First Commerce common stock that were exchanged for shares of Banc One common stock in connection with the Merger (*see* attached certification), and Plaintiff was damaged thereby.

### B.     Defendants

18.     Defendant Bank One is a multibank holding company that provides domestic retail banking, finance and credit card services through its First USA subsidiary.  Bank One's stock trades on the New York Stock Exchange ("NYSE") under the symbol "ONE."  On October 31, 1999, Banc One had 1,146,880,315 shares of its common stock outstanding. Defendant Bank One was formed as a result of an October 1998 merger involving itself, Banc One Corporation and First Chicago NBD.  Defendant Bank One was the surviving entity of the merger and succeeded to the rights and, as applicable to this Complaint, the liabilities of Banc One under applicable principles of corporate law.

19.     At all times relevant to this Complaint Banc One was a multi-bank holding company that operated banking offices in about a dozen states, including Illinois and Louisiana. Banc One reported that it had consolidated total assets of over one hundred billion dollars as of December 31, 1997.  As of December 31, 1997, Banc One was providing credit card services through its First USA subsidiary, which it had acquired earlier in 1997.  Banc One provided corporate and institutional banking services, and trust and investment management services.

20.    Defendant John B. McCoy ("McCoy") was President and Chief Executive Officer of defendant Bank One until his resignation on or about December 31, 1999. Prior thereto, McCoy had served as Chairman of the Board of Banc One from 1987 until the Merger, and as President of Banc One from 1983 to 1987. Because of McCoy's positions with Banc One, he had access to adverse, non-public information about the Company's credit card businesses, finances, products, markets, and present and future business prospects. McCoy signed the Registration Statement and Banc One's Annual Report on Form 10-K for the year ended December 31, 1997 (the "1997 Form 10-K").

21.    Defendant Richard S. Lehmann ("Lehmann") served as head of Banc One's credit card line of business from prior to the Merger until July 26, 1999, when it was announced that defendant McCoy would directly assume those responsibilities. Because of Lehmann's positions with Banc One, he had access to adverse, non-public information about the Company's credit card businesses, finances, products, markets, and present and future business prospects. Lehmann signed the Registration Statement.

22.    Defendant Michael J. McMennamin ("McMennamin") served as Vice President and the Principal Financial and Accounting Officer of Banc One at the time of the Merger. Because of McMennamin's positions with Banc One, he had access to adverse, non-public information about the Company's credit card business, finances, products, markets and present and future business prospectus. McMennamin signed the Registration Statement.

23.    The defendants listed in paragraphs 20 through 22 are collectively referred to herein as the "Individual Defendants."

24.    Each defendant is liable to Plaintiff and the Class as a direct participant in the wrongs complained of herein. The Individual Defendants each signed, and/or consented to being

8

named as a director of Banc One in, the Registration Statement and/or the Merger

Proxy/Prospectus, pursuant to which Banc One issued securities in connection with its Merger

with First Commerce.

25.     The Individual Defendants participated in the drafting, preparation, and/or

approval of various false and misleading statements contained in the Registration Statement and

Merger Proxy/Prospectus filed by the Company with the SEC in connection with the Merger.

Because of their Board memberships and/or executive and managerial positions, each of the

Individual Defendants was responsible for ensuring the truth and accuracy of the various

statements  contained in the Registration Statement and Merger Proxy/Prospectus, including the

truth of the reported operational and financial results of First USA.

26.     Each of the Individual Defendants had a duty to promptly disseminate accurate

and truthful information with respect to the Company's true operational and financial condition

and to promptly correct any previously disseminated false or misleading information.  As a result

of their failure to do so in connection with the preparation and filing of the Registration

Statement and Merger Proxy/Prospectus, the price of Banc One common stock was artificially

inflated prior to, and at the time of, the Merger, causing the Exchange Ratio to be artificially

deflated and causing injury to Plaintiff and the members of the Class.

27.     The Individual Defendants, because of their management positions and

memberships on the Board of Banc One, had the power and influence to direct the management

and activities of Banc One, and its employees, and to cause Banc One to engage in the unlawful

conduct complained of herein.  Accordingly, the Individual Defendants were able to, and did

control the contents of the Registration statement and Merger Proxy/Prospectus, including

documents incorporated by reference.  Each Individual Defendant was provided with copies of

the filings alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance, and/or to cause them to be corrected, but failed to do so.

## CLASS ACTION ALLEGATIONS

28.    Plaintiff bring this action on his own behalf, and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") consisting of all persons and entities who exchanged their First Commerce common stock for shares of Banc One common stock, pursuant to the Registration Statement and Merger Proxy/Prospectus, in connection with the Merger.  Excluded form the Class are defendants; members of the Individual Defendants' families, any entity in which any defendant has a controlling interest; and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the defendants.

29.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class who exchanged their First Commerce common stock for Banc One common stock in connection with the Merger.  Pursuant to the Registration Statement, the Company was authorized to issue, and did issue, approximately 62,599,680 shares of Banc One common stock to First Commerce shareholders in connection with the Merger.  In addition, First Commerce shareholders surrendered approximately 44,460,000 shares of First Commerce common stock in connection with the Merger.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are whether:

a)    defendants violated Sections 11, 12(a)(2), and/or 15 of the Securities Act, as alleged herein;

b)    the Registration Statement and Merger Proxy/Prospectus, and documents incorporated by Reference therein, contained materially false and misleading statements of fact;

c)    the Registration Statement and Merger Proxy/Prospectus, and documents incorporated by reference therein, omitted material facts that were necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and

d)    the members of the Class have sustained damages and, if so, the proper measure of those damages.

31.    Plaintiff's claims are typical of the claims of the members of the Class, as the claims of Plaintiff and the members of the Class are based on the same legal theories, and Plaintiff has sustained damages arising out of defendants' wrongful conduct in violation of federal law, as complained of herein.

32.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, since joinder of all members of the Class is impracticable.

11

Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for Class members individually to redress the wrongs done to them.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

34.    The statutory safe harbor provided for forward-looking statements (under certain circumstances) does not apply to any of the false statements and material omissions alleged in this complaint.  The statements alleged to be false and misleading all relate to then-existing facts and conditions.  In addition, none of the statements alleged herein were identified as "forward-looking statements" when made.  Nor did meaningful cautionary language identify important factors that could cause actual results to differ materially from those stated.  To the extent that the statutory safe harbor does apply to any statements alleged herein deemed to be forward-looking, defendants nonetheless are liable for issuing false forward-looking statements because, at the time each of the statements was made, the statements were authorized and/or approved by an executive officer of Banc One.

## SUBSTANTIVE ALLEGATIONS

A.    **The Merger**

35.    Prior to the Merger, on or about June 27, 1997, Banc One acquired First USA, making First USA a wholly owned subsidiary of Banc One.  First USA was, and is, a national banking association that maintains its principal place of business in Wilmington, Delaware.  In 1999, First USA purported to be the world's largest issuer of Visa and Master Card credit cards. It claimed over 56 million card holders and carried credit card loans of $70 billion.  Industry sources had reported a dramatic rise in First USA's fee income in 1998.  First USA was reported

12

to have earned over $1.25 billion in fee income through the third quarter of 1998, despite an actual decline in its asset base. This represented an increase of more than $312 million (or approximately 33%) over the same period in 1997.

36.     Prior to the Merger, First Commerce operated as a multi-bank holding company. On October 20, 1997, Banc One entered into an agreement and plan of merger pursuant to which First Commerce was to be merged with a wholly-owned subsidiary of Banc One.

37.     The Merger could not be completed without the approval of two thirds of the stockholders of First Commerce. Accordingly, on or about May 13, 1998, defendants issued the Registration Statement and Merger Proxy/Prospectus which, *inter alia*, solicited First Commerce shareholder votes to approve the Merger.

38.     The Registration Statement and Merger Proxy/Prospectus incorporated by reference Banc One's financial results as reported on the Form 10-K for the year ended December 31, 1997, and Banc One's results of operations for the first quarter of fiscal 1998 via Banc One's April 21, 1998 Form 8-K report. Both in the text of the Registration Statement and Merger Proxy/Prospectus, and in the SEC filings incorporated therein by reference, Banc One publicly reported a favorable growth in earnings resulting from, among other things, the successful and improving financial performance of its First USA credit card subsidiary. For example, the Registration Statement reported that Banc One's total interest income and other income increased from approximately $8.7 billion in fiscal 1994 to $10.3 billion for fiscal 1995, to $12.1 billion for fiscal 1996 and again to $13.2 billion for fiscal 1997, the fiscal year immediately preceding the Merger. Similarly, the Registration Statement reported that Bank One's net income for the first fiscal quarter of 1998 had increased to $517,600,000 from $381,900,000 for

the first quarter of fiscal 1997. These reported financial results were stated to have been prepared in accordance with Generally Accepted Accounting Principles.

39. The 1997 Form 10-K, incorporated by reference into the Registration Statement and Merger Proxy/Prospectus, also repeatedly highlighted the strength and growth of First USA's, and consequently Banc One's, credit card operations, reporting among other things:

> At December 21, 1997 First USA had approximately 40.5 million card members and $40.8 billion in managed credit card receivables and was the third largest issuer of bank credit cards in the United States.
>
> ***
>
> The generation of new credit card business during 1997 remained very strong .... In the partnership areas, a number of premier names were signed including New York Life, CountryWide Home Loans, PGA tour, American Medical Association and the Los Angeles Dodgers. This activity contributed to a record of 8.1 million new credit card accounts during the year, exceeding the previous record of 6.2 million new accounts set last year.

40. First USA comprised 36% of Banc One's managed loan portfolio (far and away the largest component). Indeed, in 1997, Banc One's average managed loan portfolio was reported to have increases 12.7%, to $109.9 billion, largely as a result of a 17.2% growth in average managed credit card loans. Managed net interest margins also increased dramatically in 1997 to 6.27%, primarily as a result of new credit card loans.

41. Defendants warranted these results in the Registration Statement and Merger Proxy/Prospectus, representing that "such financial statements, in the opinion of Banc One management, contain the adjustments, all of which are normal and recurring in nature, necessary to present fairly Banc One's consolidated financial position, results of operations, and change in cash flows."

14

42.   Defendants also represented (and warranted) in the Registration Statement and Merger Proxy/Prospectus, among other things:

a.   the timely filing of required regulatory reports;

b.   that the financial statements contained in, or incorporated into, the Registration Statement and Merger Proxy/Prospectus complied with GAAP;

c.   each party's (that is, First Commerce's and Banc One's) compliance with applicable law; and

d.   the absence of undisclosed liabilities.

43.   In the Registration Statement and/or Merger Proxy/Prospectus, the First Commerce Board unanimously recommended that First Commerce shareholders approve the Merger.  The recommendation of the First Commerce Board was based in substantial part on the perceived financial strength of Banc One, which perception, in turn, was based on Banc One's published financial statements and results of operations.  In addition, the recommendation of the First Commerce Board in favor of the Merger was based on the Board's belief that the favorable and improving results of operations of Banc One, including its First USA credit card subsidiary, were fairly and accurately presented and that there were no undisclosed material adverse problems or developments affecting the First USA operations.

44.   First Commerce shareholders approved the Merger based on the favorable recommendation of the First Commerce Board, and also based on the fairness opinion of First Commerce's financial advisor Keefe, Bruyette & Woods, Inc. ("KBW").  KBW's fairness opinion stated that the Merger, including the Exchange Ratio, was fair from a financial point of view to the shareholders of First Commerce.  That opinion was predicated in large measure on

15

the financial statements of Banc One and on KBW's belief that those financial statements fairly and accurately presented Banc One's results of operations and that there existed no material adverse problems or developments affecting Banc One's First USA credit card subsidiaries. Indeed, KBW's fairness opinion specifically states that KBW reviewed and relied upon Banc One's financial statements, including the financial statements in the 1997 Form 10K, in reaching the opinion that the Exchange Ratio was "fair."

45.    First Commerce shareholders and the investment community were led to believe that the First USA credit card operations would provide a growth engine for Banc One because, in addition to the cross-selling opportunities offered by its credit card accounts, new credit card accounts had significantly increased Banc One's: (a) fee income; (b) the margins on loan portfolios, as a result of high margin credit card loans; and (c) gains realized on the securitization of credit card loan portfolios.

46.    The Merger of Banc One and First Commerce became effective June 12, 1998, and each share of First Commerce common stock outstanding at the time of the Merger was converted into the right to receive 1.408 shares of Banc One common stock.

47.    As set forth below, the information contained in the Registration Statement and Merger Proxy/Prospectus (and the documents incorporated by reference therein) was materially false and misleading, and/or omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

**B.    Defendants Misstated First USA's Growth Because a Material Portion of Its "Growth" Had Been Generated By Illegal Practices That Violated TILA**

48.    Banc One and First USA were and/or are credit providers subject to the disclosure requirements set forth in TILA.   Congress enacted the TILA to ensure that consumers receive

"meaningful disclosure of credit terms," and "to protect consumers from inaccurate and unfair credit billing and credit card practices." TILA is construed liberally in favor of consumers and strictly against creditors by banking regulators.

49. Chapter 2 of the TILA regulates revolving charge accounts, credit cards, and other types of open-end credit. TILA mandates specific disclosures both before the first use of the credit card and also in each periodic (monthly) statement sent to the consumer.

50. The credit cards issued by First USA to its cardholders involve "open-end credit" as that term is defined and used in TILA.

51. The Federal Reserve Board's Regulation Z promulgated under the Consumer Protection Act of 1968, as amended, mandates prompt crediting of payments as of the date of receipt. Section 226.10 of Regulation Z states in relevant part:

> (a) General Rule. A creditor shall credit a payment to the consumer's account as of the date of receipt, except when a delay in crediting does not result in a finance or other charge or except as provided in paragraph (b) of this section.
>
> (b) Specific requirements for payments. If a creditor specifies, on or with the periodic statement, requirements for the consumer to follow in making payments, but accepts a payment that does not conform to the requirements, the creditor shall credit the payment within 5 days of receipt.
>
> (c) Adjustments of account. If a creditor fails to credit a payment, as required by paragraphs (a) and (b) of this section, in time to avoid the imposition of finance or other charges, the creditor shall adjust the consumer's account during the next billing cycle.

Regulation Z has the full force of law just as TILA. Therefore, violations of Regulation Z give rise to civil liability.

52. The official commentary to TILA promulgated by the Federal Reserve Board states that open-end creditors and credit card issuers are "required to credit payment[s] as of the

date of receipt." The "date of receipt" is the date that the payment instrument or other means of completing the payment reaches the creditor." TILA Official Staff Commentary to Regulation Z §226.10(a).

53.     Credit providers like First USA also are required to make certain statutory disclosures in all periodic statements sent to consumers. If there is a period of time during which the consumer must pay the balance or any portion thereof to avoid finance charges (also known as a "grace"), the periodic statement must disclose the date by which, or the time within which, payment must be made to avoid finance charges. 15 U.S.C. § 1637(b)(9).

54.     Prior to and at the time of the Merger, First USA engaged in practices that violated § 1637(b)(9) of the TILA, as interpreted by § 226.10 of Regulation Z, because First USA's disclosures and policies did not reasonably enable customers to:

      a.     make conforming payment to First USA to avoid imposition of late fees and additional finance charges; and

      b.     determine by which date, if any, credit card holders were required to make payments to First USA in order to avoid the imposition of late fees and additional finance charges or other increases in rates to credit card holders.

55.     During this time, First USA also violated TILA because it routinely failed to credit payments as of the dates of receipt (*i.e.*, the date of delivery to a First USA post office box).

56.     As a result of these violations of TILA, First USA (and thus, Banc One) recorded, recognized and reported significantly more fee and interest revenue than that to which it was entitled. As detailed below, defendants belatedly admitted these violations of TILA, and the improper recording, recognition and report of revenue, in late 1999, when they caused First USA to credit customer accounts after an internal audit and ongoing OCC review.

18



### C.    The TILA Violations Were Central
###         To First USA's and Banc One's Operations

57.    On November 1, 1999, Kristin Davis, author of the <u>Kiplinger's</u> Article, reported that: "Delayed postings, late fees and interest penalties have First USA customers seeing red."

58.    Davis, who based the article on interviews with First USA customers, former employees, complaints lodged with government regulators, and the consumer fraud class action complaints, reported that First USA had been charging its credit card customers late fees and interest in violation of TILA, and that defendants knew of (but failed to disclose) such overcharges prior to, and at the time of the consummation of, the Merger.

59.    The number of complaints about First USA was so excessive that in April 1999, Senator Phil Gramm of Texas, Chairman of the Senate Banking Committee (who also received complaints about First USA from his constituents), directed the OCC to review First USA's practices.

60.    Notably, Senator Gramm observed that First USA had already admitted violations of TILA:

> If our investigation determines that a bank has violated the Truth in Lending Act requirements for prompt crediting of payments, we will direct the bank to change its procedures and to adjust the customer's account to deduct any related late charges or finance charges. <u>In some instances, corrective actions have already been taken</u>.

[Emphasis added.]

61.    On December 2, 1999, the <u>Dow Jones Newswire</u> reported that First USA customer complaints had almost tripled to 6,213 through November 1999.

62.    Also, as reported by the <u>Kiplinger's</u> Article, First USA admitted that "it has been in talks with OCC bank examiners, and that 'some' payments made to a third-party payment processing facility in Phoenix were not posted promptly."

63.    According to a First USA spokesperson, First USA refunded late fees and interest charges to customers' accounts processed in Phoenix, Arizona between November 1998 and March 1999, which were "affected" by "accounts not being [properly] backdated."

64.    In June 1999, First USA made a "policy change" whereby late fees were not assessed on certain accounts.

65.    In fact, the "processing problems" were not limited to Phoenix, Arizona or the Spring of 1999.  Former employees interviewed by <u>Kiplinger's</u> told of several instances throughout the Country where late posting was the accepted practice, and had been  since shortly after the acquisition of First USA by Banc One in June 1997:

> Interviews with <u>former First USA employees also indicate that payment-posting problems may not have been limited to the five-month period at the Phoenix facility for which the bank has issued refunds</u>.  "Posting late was probably the second-biggest complaint after the interest rate," says Jonathan Davis, <u>who worked as a customer support representative in First USA's collections department in Orlando from September 1997 to December 1998</u>.  "The site manager said they had an independent payment-processing company in Georgia that was so incompetent that we fired them and replaced them with a new payment center in Kentucky.  I think that helped a little," Davis says.
>
> When he received a complaint, Davis says, he was told to "tell customers to mail in their payment seven to ten days in advance and to basically blame it on the post office.  There's no way to verify when payments were sent."
>
> Linn Pierce of Irving Tex., says she quit her job in the collections department in Dallas after two months because she felt customers were not being treated fairly.  <u>Customers "would send me copies of their checks with the dates on them and I'd see when we posted</u>

them.  We had to be holding those checks," Pierce says.  When she
showed the checks to supervisors, "they'd say, 'too bad it didn't
get posted.'  They kept blowing me off."

Pierce says her tenure at First USA, from November 1996 to
January 1997, contrasted sharply with her experience as a
customer-service representative at American Express for eight and
a half years.
(emphasis added)

66.     Finally, customers have filed at least three consumer fraud class action

lawsuits against First USA alleging intentional violations of TILA and related state law

violations.  One lawsuit was filed as early as June 1998 - while the Merger was occurring and

long before defendants reported their "missed earnings projections" in August 1999.

67.     As Robert W. Vague, the Chief Executive Officer of First USA, told

analysts at the August 25, 1999 analyst conference - held in response to the revelations in Banc

One's August 24, 1999 press release -  credit card profit margins were expected to decline in

1999 because of "customer attrition, and an end to accelerating late fees, and planned interest rate

concessions to customers."

68.     Incredibly, Vague and the other defendants justified their predatory tactics

by targeting earnings expectations:

"What was the imperative to do all these repricing and late-fee
moves all at one time? Didn't you run the risk of a train wreck?"
one analyst asked at the meeting.  Replied Vague: "We had an
ambitious budget and earnings targets that ended up being high,
and we were very anxious to deliver on those targets."
(emphasis added.)

### D.    Banc One's Reported Financial and Operational Results Were Materially Inflated

69.    Defendants' statements referenced in paragraphs 38 through 40, regarding the strength and growth of First USA's credit card business were materially false and misleading and/or omitted material information because, *inter alia*, such growth was not a result of the strength of First USA's operations, but rather, it was the result of defendants' violations of consumer credit protection laws, including TILA.

70.    Defendants' statements referenced in paragraph 38 through 40, concerning revenues generated from credit card fees and interest, were false and misleading because those figures were based on, among other things, revenue generated from First USA's predatory and unlawful credit card practices.  As a consequence, the earnings and revenues reported in the Registration Statement and Merger Proxy/Prospectus for Banc One were materially overstated.

71.    Defendants' statements referenced in paragraphs 38 through 40, concerning the Company's reported earnings, also were materially false and misleading, and/or omitted material information, because the reported figures were not prepared in accordance with GAAP. According to GAAP, revenue cannot be recognized when substantial contingencies exist as to full and final payment, or potential cancellation.  *See* Financial Accounting Standards Board Statement on Financial Accounting Standards Board Statement on Financial Accounting Standards ("SFAS") No. 48.  As described above, at the time the Registration Statement and Merger Proxy Prospectus was filed, First USA already had received a substantial number of complaints regarding First USA's improper payment-posting, solicitation, and other operational policies and practices, including the imposition of illegal fee and interest charges.  Thus, there

was a substantial likelihood that, *inter alia*, many customers would be lawfully entitled to receive refunds related to First USA's wrongful assessment of fees and interest charges.

72.     Moreover, the statements made in Banc One's 1997 Form 10-K concerning its "managed provision for credit losses", were materially false and misleading and omitted material information.  Banc One's provision for credit losses was understated and did not comply with GAAP.  SFAS No. 5 requires an entity to record an increase in the provision for credit losses when it is likely that an "asset has been impaired" (here the accounts receivable for the late fees and related interest), or a "liability has been incurred" (for refunds of late fees and interest charged) for an amount that can be "reasonably estimated."  As alleged above, there was a substantial likelihood that many customers would lawfully be entitled to receive refunds related to First USA's wrongful assessment of fees and interest charges.  Thus, Banc One's provision for credit losses was inadequate.

73.     Defendants' statements referenced in paragraphs 41 and 42, representing (and warranting) that the financial statements contained in, or incorporated into, the Registration Statement and Merger Proxy/Prospectus were in compliance with applicable law and GAAP, and fairly presented Banc One and Banc One's consolidated financial positions, were false and misleading because, *inter alia*, those financial statements violated GAAP.

E.     **The Truth Begins To Emerge**

74.     While the violations of TILA and the non-compliance with GAAP discussed above had been ongoing at First USA and Banc One prior to the Merger, and continued at First USA and Banc One at the time of the Merger, the public (including First Commerce shareholders) was wholly unaware of these improprieties.  Defendants' wrongdoing was not disclosed in the Registration Statement or Merger Proxy/Prospectus, and would not begin to be

23

disclosed until (at least) late 1999. When defendants ultimately began to disclose the nature and extent of their wrongdoing in late 1999, the market's reaction swiftly and undisputably established the materiality of this information in determining the true value of Banc One's common stock.

75.     On August 24, 1999, the first of a series of public disclosures was made that ultimately would reveal defendants' wrongdoing. On that date, Banc One announced reduced earnings expectations for 1999 related "entirely" to First USA. This was the first (albeit incomplete) indication that any problems existed at the First USA credit card operations and was the first (albeit incomplete) indication that Banc One would probably have to issue refunds to First USA cardholders and suffer other regulatory sanctions on account of TILA violations by First USA. On August 24, 1999, Banc One publicly reported:

> Banc One today announced that, based on a revised outlook for the second half, it anticipates full-year 1999 operating earnings per share to be between $3.60-$3.65. While down 7%-8% from current market estimates, this would be 11%-12% above 1998's operating earnings.
>
> The revised earnings outlook is entirely the result of a recent change in the growth and margin prospects for First USA, the Corporation's credit card unit. The factors driving this change include:
>
> - Acceleration in underlying trends for credit cards, specifically slower industry growth and increased competition.
>
> - Selected First USA-specific factors including:
>
>   - Lower relative marketing investment;
>
>   - Higher than anticipated account attrition, and
>
>   - Specific pricing initiatives.

This revision represents a resetting of the Corporation's base earnings level because of the lower credit card profit contribution now anticipated for the second half of 1999. The Corporation's earnings growth rate today is less than 15% given the current business mix and related returns.

"We are disappointed in this earnings estimate revision," said [McCoy ], president and chief executive officer. "We believe we are taking appropriate actions to generate solid returns and growth in the credit card business model, and our card customers remains as strong as ever.

\* \* \*

"In the recent past and continuing today," said [First USA's Richard Vague], "we have witnessed a significant acceleration in competition, including increased mail solicitation volumes and more aggressive introductory rate programs. These issues, along with tightened underwriting standards and higher account attrition, have made it more difficult to grow at targeted levels."

76.   On August 25, 1999, defendant McCoy and Vague met with analysts to discuss the August 24th announcement. According to Kiplinger's, Vague made the following statement:

Vague also told analysts that he expects credit card profit margins to drop this year because of the customer attrition, and an end to "accelerating" late fees, and planned interest-rate concessions to customers designed to boost the issuer's retention rate." "The impact will be in the area of $500 million over the next couple of quarters."
(emphasis added)

77.   Although defendants had not disclosed the full truth regarding the extent of First USA's illegal practices, the August 24, 1999 disclosures regarding the decline in First USA's business caused the market to react swiftly and severely. On August 25, 1999, the price of the Company's common stock plummeted 22.3%, or $12.625 per share, from the previous day's closing price of $55.625 per share, to close at a 52 week low of $43.00 per share. This decline

was on volume of 39,887,000 shares, more than fifteen times the daily average trading volume

for the previous week period.

78.     Moreover, although defendants attributed First USA's woes almost exclusively to

industry-wide problems and competition, other banks reported profits from their credit card lines,

and found Banc One's statements incredible.  As reported by the <u>American Banker</u> on August 26,

1999:

> MBNA Corp., which at $64.5 billion of receivables trails only
> Citigroup Inc. and First USA, was quick to distance itself from
> [Vague's competitive pressures] warning statement. It fired off a
> news release Wednesday to calm investors' worries that First
> USA's woes were an indictment of a whole industry.
>
> "Industry problems are not impacting us, " said MBNA spokesman
> Brian Dalphon. "We are growing. Our losses are stable. We are
> only losing 3% of the customer relationships we want to keep."
>
> David J. Petrini, executive vice president and chief financial officer
> of Providian Financial Corp., said: "I wouldn't call this an industry
> wide problem. The stock market represents a herd mentality."
>
> Keefe, Bruyette & Woods analyst  David S. Berry said First USA
> seems to be an exception. "My take is that First USA took its eye
> off the ball," he said.
>
> * * *
>
> "It's not surprising to me that rational consumers are leaving First
> U S A, " said Edward Mierzwinski, executive director of U. S.
> Public Interest Research Group in Washington. "The bank has been
> extremely arrogant in its charging of late fees to consumers who
> probably paid on time." (emphasis added)

79.     On October 12, 1999, the Company announced over the <u>PR Newswire</u> its

financial results for the quarter ended September 30, 1999. For the third quarter, the Company

reported operating earnings of $1.014 billion, excluding merger-related and restructuring costs,

or $0.86 per diluted share. Net income for the third quarter was reported to be $925 million, or

$0.79 per share.  The Company also reported a $1.115 billion managed provision for credit losses for the quarter.  Finally, the Company stated that its results for the third quarter "were consistent with the expectations announced on August 24, 1999" and that "[a]ctions [were] being taken . . . to reduce customer attrition and stabilize returns at First USA in coming periods."

80.    Commenting on the results of operations, defendant McCoy stated: " As expected, earnings from our credit card business declined. . . .  We continue to be highly focused on stabilizing returns at First USA and generating fundamental growth for the future.

81.    One week later, on October 19, 1999, the Company announced that, in a management realignment, it had appointed McCoy as Chairman and Verne G. Istock as president, and that Vague had "retired":

> Banc One today announced that the board of directors has unanimously endorsed a series of management and organizational changes.  They include the appointment of [McCoy] as chairman while also retaining his title of chief executive officer, and the naming of Verne G. Istock as president.
>
> "Dick Vague, head of First USA, has decided to resign to pursue other interests."  Following Vague's decision, Bill Broadman has been elected chairman and head of First USA.  Bill brings a wealth of banking, card, and electronic payment system experience to his new position.
>
> "First USA business, with their powerful information systems and direct marketing expertise, remain key competitive strengths of the company," McCoy said.  "As announced earlier, some marketing, pricing and customer service issues in the card business have temporarily slowed first USA's overall momentum.

82.    The November 24, 1999 issue of <u>American Banker</u> reported the results of an analyst roundtable discussion that shed some light on the motivation for defendants' illegal conduct:

Q. [American Banker] : Who did the pushing, Banc One or First USA?

A. Mandle [analyst with Sanford C. Bernstein & Co.]: You have to blame both. Richard [Vague, who headed First USA] took his eye off the ball because of the other responsibilities that he had been given. . . Also, senior management pushed too hard, seeking 15% earnings growth. The responsibility goes all the way to the top.

* * *

Q. [ American Banker] : How vulnerable is McCoy?

A. Ryan [Analyst with Bear Stearns & Co.]: You've got a lot of people from First Chicago [Banc One merged with First Chicago Corp in October 1998]. Verne Istock [former CEO of First Chicago and now the No.2 executive at Banc One] has run and sold two very large banks. We are in the best economic periods [sic] in American history , and Banc One has really stagnated through that entire period. It doesn't take much leap of imagination to conclude that there is a substantial increase in pressure from the board.

* **

A. Frank Suozzo [Analyst with Alliance Capital Management] : There was pressure on Dick Vague to deliver earnings results, partly because of the promises he made when the First USA deal was put together and partly because of his apparent early success. But it was hard to continue delivering those results. On [ sic ] one hand, Dick Vague felt he had to deliver, and felt he could continue to deliver, and on the other hand it was almost a requirement from management that he deliver 20% earnings.

83.    On November 1, 1999, the <u>Kiplinger's</u> Article was released, revealing that First

USA's illegal practices extended as far back as 1997.

84.    On November 10, 1999, "the other shoe dropped" when the Company announced

that "Banc One Revises 1999 Operating Earnings Outlook and Postpones Investor Update:"

Banc One today announced a revised 1999 earnings outlook and the postponement of its November 15, 1999, investor update until no later than early January 2000.

Excluding merger and special charges, the Corporation's full-year 1999 operating earnings are now targeted at $3.45-$3.55 per share.

28

The decrease in expectations principally reflects ongoing softness in earnings at First USA, Banc One's credit card and consumer lending company.

"In August we advised investors of the earnings pressure we were seeing at First USA," said [McCoy]. "Bill Broadman, newly appointed head of First USA, and his team have done an excellent job in examining and understanding the details necessary to evaluate the core trends of First USA's business. Part of this review's findings as well as the continuation of the trends noted in August, have resulted in the lower 1999 fourth quarter earnings outlook."

The Corporation's commitment to investors was to come back in the fourth quarter with a full review on the company and the outlook for 2000. But completion of a current strategic review, which is well underway, is necessary before a full understanding of the Corporation's core trends, outlook for 2000 and long-term direction can be provided. The course and duration of the review has been impacted by the previously announced management changes at First USA.

85.     As the November 12, 1999 <u>American Banker</u> reported, the Company was now saying for the first time that 1999 earnings would be approximately 15% below the *revised* analysts' expectations. The Company postponed its November 15, 1999 1:00 P.M. analyst conference until January, 2000 and refused to return phone calls from journalists and analysts.

86.     Once again the market reacted swiftly and severely. This time, the price of the Company's stock fell $4.50 per share or 11.5% from its previous day's close of $39.125 per share to close at $34.625 per share on heavy trading volume. At various points during the day, the NYSE suspended trading in the Company's stock. The stock was now down 37% from $53.8125 on August 24, 1999, before the Company announced it would not meet third-quarter earnings expectations.

87.     On or about December 31, 1999, Banc One announced that defendant McCoy had resigned.

**F.**     <u>Violations of SEC Reporting Rules</u>

88.     At the time of the Merger, defendants had inflated the price of Banc One securities by publicly issuing false and misleading statements and/or omitting to disclose material facts necessary to make defendants' statements not misleading, and had materially misled First Commerce shareholders in connection with the Merger.  Said statements and/or omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Banc One and First USA, and their operational and financial performance, accounting, reporting, and financial condition, all in violation of SEC reporting rules and federal securities laws.

89.     SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

90.     In addition, Item 303 of Regulation S-K (17 CFR§ 229.303) requires that, for interim periods, the Management Division and Analysis Section ("MD&A") of reports filed with the SEC must include, among other things, a discussion of any material changes in the registrant's results of operation with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that this discussion identify any significant elements of the registrant's income or loss from continuing operations that do not arise from or are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from

continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments ), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of matters that would have an impact on future operations and have not had an impact in the past . . .

91.     Defendants violated the foregoing SEC disclosure rules by failing to disclose the existence of known trends, events or uncertainties regarding First USA's credit card operations and/or financial results that they reasonably expected would have a material, unfavorable impact on Banc One's net revenues or income, or that were reasonable likely to result in the Company's liquidity decreasing in a material way.  Defendants' failure to disclose this material information rendered the statements that were made to shareholders of First Commerce (who were deciding as to how to vote on the Merger) materially false and misleading.

92.     Defendants were required to disclose the material facts described herein in the Registration Statement and Merger Proxy/Prospectus, but failed to do so.  Had the truth about Banc One's critical credit card operations and/or financial results been disclosed, First Commerce shareholders would not have voted to exchange their First Commerce securities at the artificially deflated Exchange Ratio of 1.408 shares of Banc One common stock for each First Commerce share of common stock.



**G.    Violations of Generally Accepted Accounting Principles**

93.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R.§ 210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.  SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

94.    All of defendants' SEC filings in connection with the Merger, including the Registration Statement, the Merger Proxy/Prospectus, and the 1997 Form 10-K, and other documents incorporated therein by reference, stated in the Notes to the financial statements:

> The consolidated financial statements for [Banc One], including its subsidiaries, have been prepared in conformity with generally accepted accounting principles.

95.    The representations that such financial statements were prepared in accordance with GAAP were false and misleading for each of the reasons set forth below.

96.    The GAAP requirement for recognition of an adequate provision for reserves and an associated allowance applies to interim, as well as annual financial statements, as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and

expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

97.    Statements of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies, states that:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met:
>
> (a) Information available prior to issuance of the financial statements indicates that an asset had been impaired or that a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss and;
>
> (b) The amount of the loss can be reasonably estimated.

98.    In this particular matter, "information available prior to issuance" of the Company's financial statements that were included in the Registration Statement and Merger Proxy/Prospectus indicated that "an asset had been impaired or that a liability had been incurred at the date of the financial statements" for refunds of credit card late charges.

99.    Therefore, defendants were required (but failed) to provide for the loss through a charge to income in the financial statements by no later than the time (a) the Registration Statement and Merger Proxy/Prospectus were filed with the SEC and issued to First Commerce shareholders, (b) the First Commerce shareholders were considering how to vote on the Merger, and/or (c) the Merger was completed on June 12, 1998.

100.    In addition, all of defendants' SEC filings issued in connection with the Merger departed from the GAAP principles of revenue and expense recognition and matching of revenue with expenses.

101.    More specifically, Banc One, and its predecessor entity, substantially departed from SFAS No.s 05 and 06.  SFAS No. 6, ¶ 78 states that:

33

Revenues are inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods rendering services, or other activities that constitute the entity's major or central operations.

102.    Significantly, ¶ 79 explains further that:

Revenues represent actual or expected cash inflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations.

103.    Here, Banc One recognized revenues that it was not entitled to recognize, against the stated policy of revenue recognition in Note 1 to the financial statements and in violation of principles set forth above and below.

104.    "Recognition is the process of formally recording or incorporating an item in the financial statements of an entity as an asset, liability, revenue, expense or the like. (SFAS No. 05, ¶ 58)." An item cannot be recognized in the financial statements under GAAP unless it meets four fundamental recognition criteria set forth in SFAS No. 05, ¶¶ 63-77. Those criteria are:

a.    definition:  A resource must meet the definition of an asset; an obligation must meet the definition of a liability; and a change in equity must meet the definition of a revenue, expense, gain, loss . . .;

b.    measurability: The item must have a relevant attribute that can be quantified in monetary units with sufficient reliability, the two primary qualitative characteristics of accounting information;

c.    relevance: An item is relevant if the information about it has the capacity to make a difference in investors, creditors' or other users' decisions;

d.    reliability:  An item is reliable, if the information about it is representational, faithful, verifiable, and neutral.  The information must be faithful in its representation, free of error, and unbiased.

105.    Revenues and gains are not recognized until realized or realizable, as discussed above. (SFAS No. 05, ¶ 83(a)). Further, "[r]evenues are not recognized until earned . . . and

revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." (*Id.* at ¶ 83(b)).

106. The financial statements of Banc One, and its predecessor entity, contained in the SEC filings incorporated by reference into the Registration Statement and Merger Proxy/Prospectus, did not comply with the following requirements of GAAP:

a. The requirement that revenue cannot be recognized when substantial contingencies exist as to full and final payment or potential cancellation. SFAS No.48 (Revenue Recognition When Right of [Cancellation] Exists);

b. The requirement that any existing condition, situation or set of circumstances involving an uncertainty when there is at least a reasonable possibility that a loss or an additional loss may have been incurred must be disclosed. SFAS No.5 (Accounting for Contingencies);

c. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. SFAS No. 1));

d. The principle that financial reporting should provide accurate information about an enterprise's financial performance during a period. (SFAS No. 1, ¶ 42 );

e. The principle that financial reporting should be reliable in that it represents what it purports to represent. (SFAS No.2, ¶¶ 58-59);

f. The principle of completeness. (SFAS No.2, ¶¶ 79-80); and

g. The principle of conservatism. (SFAS No.2, ¶¶ 95, 97).

## COUNT I
### Against Bank One For
### Violations of Section 11 of the Securities Act

107. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein. This Count is asserted against Bank One for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all First Commerce shareholders

35

who exchanged their First Commerce common stock for Banc One common stock issued in connection with the Merger, and pursuant to the Registration Statement and Merger Proxy/Prospectus.

108.    The Registration Statement and Merger Proxy/Prospectus, and those documents and disclosures incorporated by reference therein, were materially false and misleading; contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the Registration Statement and Merger Proxy/Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Registration Statement and Merger Proxy Prospectus included, but were not limited to (a) the overstatement and misrepresentation of earnings at Banc One's and First USA's credit card division due to the fact that, *inter alia*, a material portion of that division's earnings resulted from violations of TILA and other laws; and (b) the failure to disclose material information relating to the purported growth of Banc One's and First USA's credit card operations and the basis on which such growth was achieved.

109.    Banc One was the registrant for the shares issued pursuant to the Merger, and filed the Registration Statement as the issuer of its common stock, as defined in Section 11(a)(5) of the Securities Act.

110.    Banc One was the issuer of the common stock issued pursuant to the Registration Statement.  As issuer of such common stock, Banc One is liable to Plaintiff and the members of the Class who exchanged First Commerce common stock for Banc One common stock in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus.



111.   Plaintiff and members of the Class each acquired Banc One common stock issued pursuant to the Registration Statement and Merger/Prospectus.

112.   At the time they acquired Banc One's common stock pursuant to the Registration Statement and Merger Proxy/Prospectus, neither Plaintiff nor any member of the Class knew, or by the exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

113.   This action was brought within one year after the discovery of the untrue statements and/or omissions and within three years after the Banc One common stock was acquired in connection with the Merger.

114.   By reason of the foregoing, Banc One violated Section 11 of the Securities Act and is liable to Plaintiff and the members of the Class, each of whom has been damaged by reason of such violation.  Defendant Bank One is liable for Banc One's violations of Section 11 of the Securities Act under applicable principles of corporate law.

**COUNT II**
**Against the Individual Defendants**
**For Violations Of Section 11 Of The Securities Act**

115.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein. This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of First Commerce shareholders who exchanged their First Commerce common stock for Banc One common stock issued in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus.

116.   The Registration Statement and Merger Proxy/Prospectus, and those documents and disclosures incorporated therein by reference, were materially false and misleading;

37

contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the Registration Statement and Merger Proxy/Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from the Registration Statement and Merger Proxy/Prospectus included, but were not limited to, (a) the overstatement and misrepresentation of earnings at Banc One's and First USA's credit card division due to the fact that, *inter alia*, a material portion of that division's earnings resulted from violations of TILA and other laws; and (b) the failure to disclose material information relating to the purported growth of Banc One's and First USA's credit card operations and the basis of which such growth was achieved.

117.    The Individual Defendants were responsible for the contents of the Registration Statement and Merger Proxy/Prospectus and caused their filings with the SEC.

118.    The Individual Defendants signed the Registration Statement consented to being named therein as directors of Banc One, and caused it to be prepared, filed with the SEC and circulated to shareholders of First Commerce.

119.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Merger Proxy/prospectus, were true, were without omission of any material facts, and/or were not misleading.

120.    Plaintiff and other members of the Class each acquired Banc One common stock issued pursuant to the Registration Statement and Merger Proxy/Prospectus.

121.    At the time they acquired Banc One's common stock pursuant to the Registration Statement and Merger Proxy/Prospectus, neither Plaintiff nor any member of the Class who

38

exchanged their First Commerce common stock for Banc One common stock knew, or by the exercise of reasonable care could have known, of the facts concerning the material misstatements and/or omissions alleged herein.

122.    This action was brought within one year after the discovery of the untrue statements and/or omissions, and within three years after the Banc One common stock was acquired in connection with the Merger.

123.    By reason of the foregoing, the Individual Defendants violated Section 11 of the Securities Act and are liable to Plaintiff and the members of the Class, each of whom has been damaged by reason of such violation.

**COUNT III**
**Against Bank One For Violations Of**
**Section 12(a)(2) Of The Securities Act**

124.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein.  This Count is asserted against Bank One for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) on behalf of all First Commerce shareholders who exchanged their First Commerce common stock for Banc One common stock issued in connection with the Merger and pursuant to the Registration Statement and Merger Proxy/Prospectus.

125.    As set forth in the Registration Statement and Merger Proxy/Prospectus Statement, First Commerce shareholders received 1.408 shares of Banc One common stock for each share of First Commerce common stock they sold pursuant to the Merger.  Banc One, acting through employees and others, including, but not limited to, the Individual Defendants, solicited such exchanges through the preparation and dissemination of the Registration Statement and Merger Proxy/Prospectus.

39

126.    The Registration Statement and Merger Proxy/Prospectus Statement contained

untrue statements of material facts, and concealed and failed to disclose material facts, as

detailed above.  Banc One and its employees and agents owed Plaintiff and the other members of

the Class the duty to make a reasonable and diligent investigation of the statements contained in

the Registration Statement and Merger Proxy/Prospectus to ensure that such statements were true

and that there was no omission of material facts required to be stated in order to make the

statements contained therein not misleading.  Banc One, in the exercise of reasonable care by its

employees and agents, should have known of the misstatements and omissions contained in the

Registration Statement and Merger Proxy/Prospectus, as set forth above.

127.    At the time they exchanged their First Commerce common stock for Banc One

common stock issued pursuant to the Registration Statement and Merger Proxy/Prospectus,

Plaintiff and the other members of the Class did not know, nor in the exercise of reasonable

diligence could they have known, of the material misstatements and/or omissions alleged herein.

128.    By reason of the conduct alleged herein, Banc One violated Section 12(a)(2) of

the Securities Act.  As a direct and proximate result of such violations, Plaintiff and other

members of the Class sustained substantial damages in connection with their exchange of First

Commerce common stock for shares of Banc One common stock.  Accordingly, Plaintiff and the

other members of the Class who acquired Banc One common stock issued pursuant to the

Registration Statement and Merger Proxy/Prospectus were harmed, and seek damages and/or

rescission to the extent permitted by law.  Defendant Bank One is liable for Banc One's

violations of Section 12(a)(2) of the Securities Act under applicable principles of corporate law.

## COUNT IV
### Against The Individual Defendants For
### Violations Of Section 15 Of The Securities Act

129.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing and subsequent paragraphs, as if fully set forth herein. This Count is brought against the Individual Defendants pursuant to Section 15 of the Securities Act on behalf of all First Commerce shareholders who acquired Banc One common stock in connection with the Merger.

130.    Each of the Individual Defendants was a controlling person of the Company within the meaning of Section 15 of the Securities Act at the time of the Merger. At the time First Commerce was merged with and into Banc One, and when the Registration Statement and Merger Proxy/Prospectus were filed with the SEC, each of the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading Registration Statement and Merger Proxy/Prospectus.

131.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Merger Proxy/Prospectus were true and devoid of any omissions of material facts. Therefore, by reason of their positions of control over Banc One, as alleged herein, each of the Individual Defendants is jointly and severally liable with, and to the same extent as, Banc One to Plaintiff and other members of the Class as a result of the wrongful conduct alleged herein.

### PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding damages in favor of Plaintiff and the other members of the Class against all defendants for the damages sustained as a result of defendants' wrongdoing together with interest thereon;

C.     Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. Rule 37 (b), Plaintiff demands a trial by jury.

Dated August 18, 2000.

STULL, STULL & BRODY

By: _____
Edwin J. Mills
Aaron Brody
6 East 45th Street
New York, New York  10017
(212) 687-7230

WEISS & YOURMAN
Joseph H. Weiss
551 Fifth Avenue
Suite 1600
New York, New York  10176
(212) 682-3025

Designated Local Counsel
ROBERT D. ALLISON & ASSOCIATES
Robert D. Allison (ID. No. 36749)
122 South Michigan Avenue
Suite 1850
Chicago, Illinois  60603
(312) 427-4500

C:\Ed Mills\First Commerce-Complaint-8-16-2000.wpd

## PLAINTIFF CERTIFICATION

Thomas Levitan ("Plaintiff") hereby states that:

1.   Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.   Plaintiff did not purchase any common stock/securities of **First Commerce Corp.** or its successor, **Bank One Corp.**, at the direction of his/her counsel or in order to participate in this private action.

3.   Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff was the owner of **First Commerce Corp.** common stock prior to and during the period beginning on May 13, 1998 and through the completion of the merger of **Bank One Corp.** and **First Commerce Corp.** on June 12, 1998, as specified in the complaint, and Plaintiff received 280 shares of **Bank One Corp.** common stock pursuant to the merger in exchange for the **First Commerce Corp.** common stock.

The following includes all of Plaintiff's transactions in **Bank One Corp.** subsequent to June 12, 1998 and up to the date of this Plaintiff Certification:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| One. Div Rein | Div Rein | 9-30.98 | 42.75 | 24 |
| ONE - Div Rein | Div Rein | 1-4.99 | 51.96 | 1.99 |
| ONE. Div Rein | Div Rein | 4-1.99 | 54.30 | 2.123 |

C:\First Commerce\plaintiff Certification-Thomas Levitan.wpd

| One - Div Rein | Div Rein | 7-1-99 | 60.60 | 1.92 |
|---|---|---|---|---|
| One - Div Rein | Div Rein | 10-1-99 | 34.88 | 3.35 |
| One - Div Rein | Div Rein | 1-3-00 | 31.10 | 3.81 |
| One - Div Rein | Div Rein | 4-3-00 | 36.54 | 2.19 |

5.    Check one: Plaintiff (did ___, did not ✗ ) own securities of **Bank One Corp.** prior to the June 12, 1998 merger of **Bank One Corp.** and **First Commerce Corp.**

6.    Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this 24 day of April , 2000 in Claremont, CALIF .

(City)        (State)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

THOMAS LEVITAN

## DEFENDANTS

JOHN B. McCOY, JR., RICHARD J. LEHMANN
MICHAEL J. McMENNAMIN,
and BANK ONE CORP

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Los Angeles Cty.
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

00C 5096

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Edwin J.
Mills, Aaron Brody; Stull Stull & Brody, 6 E.
45th St., NY, NY 10017; 212-687-7230; R.D. Allison
& Assoc., 122 S. Michigan, #1850, Chgo., IL 60603
312-427-7600

ATTORNEYS (IF KNOWN)

JUDGE COAR

MAGISTRATE JUDGE KEYS

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY    PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury — | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product        Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |      Liability       ☐ 365 Personal Injury — |      of Property 21 USC 881 |  | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &       Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 460 Deportation |
|      & Enforcement of Judgment |      Slander       ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'       Injury Product Liability | ☐ 650 Airline Regs | ☐ 830 Patent |      Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |      Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 810 Selective Service |
|      Student Loans | ☐ 340 Marine   PERSONAL PROPERTY |      Safety/Health |  | ☐ 850 Securities/Commodities/ |
|      (Excl. Veterans) | ☐ 345 Marine Product   ☐ 370 Other Fraud | ☐ 690 Other |  |      Exchange |
| ☐ 153 Recovery of Overpayment |      Liability       ☐ 371 Truth in Lending |  | LABOR   SOCIAL SECURITY | ☐ 875 Customer Challenge |
|      of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 380 Other Personal |  | ☐ 710 Fair Labor Standards   ☐ 861 HIA (1395ff) |      12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle        Property Damage |  |      Act           ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract |      Product Liability   ☐ 385 Property Damage |  | ☐ 720 Labor/Mgmt. Relations   ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury       Product Liability |  |                    ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
|  |  |  | ☐ 730 Labor/Mgmt. Reporting   ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| REAL PROPERTY | CIVIL RIGHTS   PRISONER PETITIONS |  |      & Disclosure Act | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motion to Vacate |  | ☐ 740 Railway Labor Act   FEDERAL TAX SUITS |      Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment        Sentence |  |                   ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/       HABEAS CORPUS: |  | ☐ 790 Other Labor Litigation      or Defendant) |      Under Equal Access to Justice |
| ☐ 240 Torts to Land |      Accommodations   ☐ 530 General |  |                   ☐ 871 IRS — Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare   ☐ 535 Death Penalty |  | ☐ 791 Empl. Ret. Inc.      26 USC 7609 |      State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights   ☐ 540 Mandamus & Other |  |      Security Act | ☐ 890 Other Statutory Actions |
|  | ☐ 550 Civil Rights |  |  |  |
|  | ☐ 555 Prison Condition |  |  |  |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

§§11, 12(a)(2) and 15 of the Securities Act. 15 U.S.C. §§77K, 77(a)(2), and 77(o).
False and misleading statements in connection with merger in Registration Statement, Properties and Press releases.

## VII. REQUESTED IN COMPLAINT

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:  ☒ YES  ☐ NO

## VIII.   This case

☒ is not a refiling of a previously dismissed action.

☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE
August 18, 2000

SIGNATURE OF ATTORNEY OF RECORD
Bruce C. Howard

1 - 2

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**
EASTERN DIVISION

DOCKETED

AUG 21 2000

FILED-F.05
00 AUG 18 PH 3:38
CLERK
U.S. DISTRICT COURT

In the Matter of
Thomas Levitan
          v.                )
John B. McCoy, et al.       )
                            )

C...**00C 5096**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff

**JUDGE COAR**

**MAGISTRATE JUDGE KEYS**

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Edwin J. Mills | NAME Aaron Brody |
| FIRM Stull, Stull & Brody | FIRM Same as (A) |
| STREET ADDRESS 6 East 45th Street | STREET ADDRESS Same as (A) |
| CITY/STATE/ZIP New York, NY   10017 | CITY/STATE/ZIP Same as (A) |
| TELEPHONE NUMBER (212) 687-7230 | TELEPHONE NUMBER Same as (A) |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☒ | MEMBER OF TRIAL BAR?   YES ☐   NO ☒ |
| TRIAL ATTORNEY?   YES ☒   NO ☐ | TRIAL ATTORNEY?   YES ☒   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☒ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Robert D. Allison | NAME Bruce C. Howard |
| FIRM Robert D. Allison & Assoc. | FIRM Same as (C) |
| STREET ADDRESS 122 South Michigan, Ste. 1850 | STREET ADDRESS Same as (C) |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP Same as (C) |
| TELEPHONE NUMBER (312) 427-7600 | TELEPHONE NUMBER Same as (C) |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 36749 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6180529 |
| MEMBER OF TRIAL BAR?   YES ☒   NO ☐ | MEMBER OF TRIAL BAR?   YES ☒   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☒ | TRIAL ATTORNEY?   YES ☐   NO ☒ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☒   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☒   NO ☐ |

PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.

1-3

Aug-10-00  04:05pm  From-                                    +3124271850                    T-910  P.02/02  F-894

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In the Matter of

Thomas Levitan )
        v.          )
John B. McCoy, et al.  )

**00C 5096**

Case Number:

DOCKETED

AUG 21 2000

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

                    Plaintiff                              **JUDGE COAR**

                                            **MAGISTRATE JUDGE KEYS**

| (A) | (B) |
|-----|-----|
| SIGNATURE | SIGNATURE |
| NAME Edwin J. Mills | NAME Aaron Brody |
| FIRM Stull, Stull & Brody | FIRM Same as (A) |
| STREET ADDRESS 6 East 45th Street | STREET ADDRESS Same as (A) |
| CITY/STATE/ZIP New York, NY  10017 | CITY/STATE/ZIP Same as (A) |
| TELEPHONE NUMBER (212) 687-7230 | TELEPHONE NUMBER Same as (A) |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☒ | MEMBER OF TRIAL BAR? YES ☐ NO ☒ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ |

| (C) | (D) |
|-----|-----|
| SIGNATURE | SIGNATURE |
| NAME Robert D. Allison | NAME Bruce C. Howard |
| FIRM Robert D. Allison & Assoc. | FIRM Same as (C) |
| STREET ADDRESS 122 South Michigan, Ste. 1850 | STREET ADDRESS Same as (C) |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP Same as (C) |
| TELEPHONE NUMBER (312) 427-7600 | TELEPHONE NUMBER Same as (C) |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 36749 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6180529 |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☒ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☒ | TRIAL ATTORNEY? YES ☐ NO ☒ |
| DESIGNATED AS LOCAL COUNSEL? YES ☒ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☒ NO ☐ |

**PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.**

1-4

# INSTRUCTIONS FOR COMPLETING APPEARANCE FORM

### 1.   General Information

General Rule 3.15 provides that once an attorney has filed an appearance form on behalf of a party, no additional appearances or substitutions may be made without leave of Court. The Rule also provides that the attorney may not withdraw without leave of Court. Therefore, if more than one attorney is going to represent the party or parties shown on the front of this form, each should complete the attorney appearance section of the form.

This form is designed to permit the filing of appearances by up to four attorneys who represent the same party or parties. If more than four attorneys representing the same party or parties wish to file appearances, additional forms should be used and the letters (A), (B), (C), (D) indicating the attorneys should be altered to (E), (F), (G), (H), respectively for the fifth through the eighth attorneys, etc.

### 2.   Listing of Parties for Whom the Attorney is Appearing

The name of each of the parties represented by the attorney(s) filing the appearance are to be listed on the lines immediately below the words "Appearance(s) are hereby filed by the undersigned as attorney(s) for:". The type of party, e.g., plaintiff, defendant, third party plaintiff, should follow each party. If all of the parties are of the same type, e.g., all parties represented are plaintiffs, then the type of party can be shown at the end of the listing of parties.

### 3.   Completing Attorney Information

The information requested should be completed for each attorney filing an appearance. Where two or more attorneys are from the same firm, only the first listed from the firm need complete the information for firm name, street address and city/state/ZIP. The others may indicate "Same as (letter designation of first attorney)."

### 4.   Identification Number

Attorneys who are members of the Illinois bar should enter the identification number issued to them by the Illinois Attorney Registration and Disciplinary Commission (A.R.D.C.). Attorneys who are not members of the Illinois bar should leave this item blank.

### 5.   Attorney (A) and Notices

Where more than one attorney is listed on the appearance form, all listed will be entered on the docket of the Clerk as attorneys of record. However, notices will only be mailed to the attorney shown in box (A) on the form except where local counsel has been designated pursuant to General Rule 3.13 (see below). The attorney is responsible for notifying all other attorneys included on the form of the matter noticed.

Where appearances are filed on behalf of attorneys representing a state or local government, e.g., States Attorney, Corporation Counsel, the persons filing the appearance may wish to list the name of the assistant who is in active charge of the case in box (A) and the appearance of the head of the agency, e.g., attorney general, corporation counsel, or any other assistant assigned to the case in subsequent boxes. In this way, the assistant in active charge will receive notice.

### 6.   Appearances and Trial Bar Membership

All attorneys filing appearances must indicate whether or not they are members of the trial bar of this Court and whether or not they are the attorney who will try the case in the event that it goes to trial.

In criminal actions, an attorney who is not a member of the trial bar may not file an individual appearance. Pursuant to General Rule 3.10, a member of the trial bar must accompany such attorney and must also file an appearance.

In civil actions, an attorney who is not a member of the trial bar should designate the trial bar attorney who will try the case in the event that it goes to trial. If a trial bar attorney is not listed on the initial appearance and the case goes to trial, a trial bar attorney, pursuant to General Rule 3.15, must obtain leave of Court to file an appearance.

### 7.   Designation of Local Counsel

Pursuant to General Rule 3.13, an attorney who does not have an office in this District may appear before this Court "only upon having designated, at the time of filing his/her initial notice or pleading, a member of the bar of this Court having an office within this District upon whom service of papers may be made." No attorney having an office in this District may designate local counsel. No attorney may designate more than one attorney as local counsel. Notices will be mailed by the Clerk's Office to both the attorney shown in box (A) and the attorney designated as local counsel.

Revised 4/1/91

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

FILED

STATE OF LOUISIANA

2006 MAY 12  P 4: 29

NO. 2006-03825                                            DIVISION "L-6"

ELIZABETH BOLTON HASSINGER, MARY BOLTON JENNINGS,
ROBERT H. BOLTON, JR., CATHERINE HASSINGER DRENNAN,
MARY HASSINGER SCHMIDT, ELIZABETH HASSINGER VAN HORN,
ELIZABETH BOLTON JENNINGS, JAMES K. JENNINGS III, PAUL M. DAVIS, JR.,
FRANCES BOLTON DAVIS, PAUL M. DAVIS, III, JAMES BOLTON DAVIS,
FRANCES SENTELL DAVIS, FRANKLIN HAAS MIKELL, WILLIAM HENRY HODGES,
JR., JOY N. HODGES, LUCILLE HODGES, PHILIP N. HODGES, ROANE E. HATHORN,
PAT BOLTON, CORNELIA FAHY JARRELL DEWITT, SUZANNE BOLTON MELLOR,
and the SUCCESSION OF ELIZABETH BROOKS BOLTON c/o MARTHA BARTON

VERSUS

JP MORGAN CHASE AND COMPANY

FILED: _____      _____

                                    DEPUTY CLERK

**FIRST SUPPLEMENTAL AND AMENDED PETITION**

**NOW INTO COURT**, through undersigned counsel, come plaintiffs, Elizabeth Bolton Hassinger, Mary Bolton Jennings, Robert H. Bolton, Jr., Catherine Hassinger Drennan, Mary Hassinger Schmidt, Elizabeth Hassinger Van Horn, Elizabeth Bolton Jennings, James K. Jennings III, Paul M. Davis, Jr., Frances Bolton Davis, Paul M. Davis, III, James Bolton Davis, Frances Sentell Davis, Franklin Haas Mikell, William Henry Hodges, Jr., Joy N. Hodges, Lucille Hodges, Philip N. Hodges, Roane E. Hathorn, Pat Bolton, Cornelia Fahy Jarrell Dewitt,[1] Suzanne Bolton Mellor, Succession of Elizabeth Brooks Bolton c/o Martha Barton, Frank R. Bolton, Jr., Thomas A. Bolton, Succession of William L. Taylor c/o Mary Ann Taylor, S. Conrad Weil, Sr. Irrevocable Family Trust, Bertie H. Weil Management Trust, S. Conrad Weil, Jr., Elizabeth Ray Jarrell Craig, Jane Ann Jarrell Lee, Sally Foote Jarrell McMichael, Shonnette Kahn, and Roscoe Bolton ("Plaintiffs"), who in accordance with the provisions of the Louisiana Code of Civil Procedure art. 1151, amend their original petition to add the following plaintiffs: Frank R. Bolton, Jr., Thomas A. Bolton, Succession of William L. Taylor c/o Mary Ann Taylor, S. Conrad Weil, Sr. Irrevocable Family Trust, Bertie H. Weil Management Trust, S. Conrad Weil, Jr., Elizabeth Ray Jarrell Craig, Jane Ann Jarrell Lee, Sally Foote Jarrell McMichael, Shonnette Kahn, and Roscoe Bolton.

---

[1] Cornelia Fahy Jarrell Dewitt was incorrectly referred to as Fay Dewitt in the Original Petition.

80242v1

I.

Plaintiffs re-aver the allegations of fact and prayer for relief contained in their original

petition as if set forth herein *in extenso*.

Respectfully submitted:

James R. Swanson, #18455
Loretta G. Mince, #25796
Lance C. McCardle, #29971
CORRERO FISHMAN HAYGOOD
   PHELPS WALMSLEY & CASTEIX, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for Plaintiffs*

**\*Plaintiffs will serve the following Defendant via the Louisiana Long Arm Statute:**

JP Morgan Chase & Co.
through its registered agent
The Corporation Trust Co.
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801

ATTORNEY'S NAME: Swanson, James Richard, Esq.   18455
AND ADDRESS:      201 St. Charles Avenue
                  46 th. Floor
                  New Orleans  LA       70170

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

NO. 20 06-03825                                    SECTION: 06-L

HASSINGER, ELIZABETH BOLTON            ETAL
          vs.
JP MORGAN CHASE AND COMPANY

C I T A T I O N

TO:      JP MORGAN CHASE AND COMPANY
THROUGH: VIA THE LOUISIANA LONG ARM STATUTE
         THROUGH ITS REGISTERED AGENT: THE CORPORATION TRUST CO.
         CORPORATION TRUST CENTER   1209 ORANGE STREET
         WILMINGTON  DE

YOU HAVE BEEN SUED:

You must either comply with the demand contained in the petition
FIRST SUPPLEMENTAL AND AMENDED PETITION
a certified copy of which accompanies this citation, or file an answer or other
legal pleading in the office of the Clerk of this Court, Room 402, Civil Courts
Building, 421 Loyola Avenue, New Orleans, LA, within fifteen (15) days after the
service hereof under penalty of default.                  Thirty (30)

*********************************************************************************
*              ADDITIONAL INFORMATION                                          *
*    Legal assistance is advisable.  If you want a lawyer and can't find one, you *
* may call the New Orleans Lawyer Referral Service at 561-8828.  This Referral  *
* Service operates in conjunction with the New Orleans Bar Association.  If you  *
* qualify, you may be entitled to free legal assistance through the New Orleans  *
* Legal Assistance Corp.; you may call 529-1000 for more information.           *
* COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE.                       *
*********************************************************************************

IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of The Civil
District Court for the Parish of Orleans, State of LA May      12, 2006.

Clerk's Office, Room 402, Civil Courts Building      DALE N. ATKINS, Clerk of
421 Loyola Avenue                                    The Civil District Court
New Orleans, LA                                      for the Parish of Orleans
                                                     State of LA

                                                     by _____
                                                          Deputy Clerk
-------------------------------------------------------------------------------
                        SHERIFF'S RETURN:
                  (for use of process servers only)

PERSONAL SERVICE                        DOMICILIARY SERVICE

On this ____ day of ____               On this ____ day of ____
     served a copy of the w/i petition      served a copy of the w/i petition
FIRST SUPPLEMENTAL AND AMENDED PETITION FIRST SUPPLEMENTAL AND AMENDED PETITION
On JP MORGAN CHASE AND COMPANY          On JP MORGAN CHASE AND COMPANY
     in person through                       through
VIA THE LOUISIANA LONG ARM STATUTE      VIA THE LOUISIANA LONG ARM STATUTE
                                        by leaving same at the dwellinghouse,
                                        or usual place of abode,
                                        THROUGH ITS REGISTERED AGENT: THE CORPOR
                                        ATION TRUST CO.
                                        CORPORATION TRUST CENTER   1209 ORANGE S
                                        TREET
                                        in the hands of ____
                                        a person of suitable age and discretion
                                        residing therein as a member of the dom-
                                        iciliary establishment, whose name and
            Returned same day           other facts connected with this service
                                        I learned by interrogating   HIM / HER
                             No. ____   the said JP MORGAN CHASE AND COMPANY
                                                       being absent from
Deputy Sheriff of _____          the domicile at time of said service.

                                                  Returned same day
Mileage:  $ _____
                                                                  No. ____

                                        Deputy Sheriff of _____

        _____ ENTERED _____
        PAPER          RETURN

_____ /_____ /_____
SERIAL NO.  DEPUTY      PARISH